# The Susquehanna and Wyoming Valley Railroad and Coal Co. *versus* Quick.

1. There is no distinction between a trespasser without and one with title on record.

2. When the question is upon the extent of possession of one without title, the deed or other evidence of supposed title may give color to and extend the possession by presumption beyond his actual enclosure or cultivation, but has no effect as to whether he has continued in possession.

3. A trespasser on a title cannot maintain the continuity of possession if he actually abandon it, although with intent to return.

4. Such case does not resemble that of a settler.

5. The *animus revertendi* in a settler evinces his intention to gain a *rightful* title under the state.

6. Non-residence will not toll the statute, if the party keeps up his possession by cultivation.

7. Actual possession may be either by residence or cultivation; it need not be by both.

8. When one leaves the ground personally, he must leave it under circumstances indicating that he still holds the possession.

9. There must be that in the appearance of the premises themselves to show the world that there is still a person in possession.

10. The character of the possession of a party as stated by himself while in possession is part of the *res gestæ.*

11. The exemplification of a record in loose and detached parts is inadmissible in evidence; it must be made up and certified as a whole.

12. Cunningham v. Patton, 6 Barr 355, criticised; Stephens v. Leach, 7 Harris 262, recognised.

March 15th and 16th 1871. Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ. WILLIAMS, J., at Nisi Prius.

Error to the Court of Common Pleas of *Susquehanna county:* To March Term 1871.

This was an amicable action of ejectment commenced April 6th 1858, in Luzerne county, in which Peter A. L. Quick was plaintiff, and The Susquehanna and Wyoming Valley Railroad and Coal

[Susquehanna, &c., Railroad Co. *v.* Quick.]

Company were defendants. The land in controversy was a tract of 383 acres known as the Miner tract, and a tract of 206 acres known as the Lewis tract.

The case was tried in Luzerne county in February 1868, and a verdict and judgment rendered for the plaintiff for the Miner tract. The record was removed to the Supreme Court, the judgment reversed, and a *venire de novo* awarded (11 P. F. Smith 328). It was afterwards certified to the Court of Common Pleas of Susquehanna county; it was tried there, October 18th 1870, before Streeter, P. J.

On the 4th of June 1810, the Miner lot was patented to Thomas Wright. On the 1st of August 1825, Asher Miner, executor, &c., of Thomas Wright, deceased, by virtue of authority in his will, conveyed the Miner tract to John B. Quick. John B. Quick, Warmoldus Cooper and Abraham Lefoy, having become the owners of the Lewis lot (the southerly half of a lot numbered 43, the northerly half being known as the David lot), a patent was issued to them for it; viz. one-fourth to Quick and three-fourths to Cooper and Lefoy.

On the 17th of October 1825, John B. Quick, Cooper and Lefoy conveyed to Isaac Frost and J. B. Loring the Miner, Lewis and David lots in trust for an association for the purpose of mining, &c., the members of the association to hold interests in the same by fortieth undivided parts, of which John B. Quick was to retain ten or one-fourth of the whole. On the 3d of February 1844, John B. Quick conveyed to the plaintiff " three-fourth parts or all my interest, in lot 42 (Miner) and in Lewis's part of No. 43." This deed was recorded.

On the 18th of May 1853, all the title held by Frost and Loring became vested in John M. Cooper, and up to that time the interests of other members of the association, not including the interest which had been in John B. Quick, were vested in Cooper. Cooper's title, through other conveyances, became vested in the National Anthracite Coal Company, and from them in the defendants. The leading question in the case was the Statute of Limitations.

On the trial the plaintiff gave evidence as follows:—George Whitbeck testified that Jacob R. Quick, a son of John B. Quick, had raised coal in 1841 or 1842 on the Miner and Lewis' lots. In 1852 Jacob R. Quick lived on the Miner lot in a log-house, and left about 1854 of his own accord; the three tracts were called " the Quick property." He spoke of a number of other persons being on the land in controversy, and of having heard some of them say that they were there as tenants of the plaintiff. On cross-examination, his testimony tended to show that there had been no regular occupancy, and that during part of the time, some of the occupants were mining for the Anthracite Coal Com-

·pany. The witness was not able to speak definitely as to the dates when any of those who were on the land went on.

Other witnesses testified of John B. Quick having come on the land in or about 1825 to 1828, and had coal uncovered on the Miner lot, but did not clear any land; brought his son Jacob on the land, who, whilst he was on it, called it his. John B. Quick himself never stayed on the land long at a time. About 1856, whilst the land was occupied by a man named Decker, the plaintiff was there; some three men, one of whom was Page, came there, the plaintiff forbade them; they told plaintiff to leave and put him off; those who put him off said they did so by virtue of a writ of possession which they showed.

Jacob R. Quick, son of John B. Quick and brother of plaintiff, testified that in 1826 a man named Tinklepaugh was on the Miner lot; his father took out coal; witness went into the Miner lot in 1841 under John B. Quick, opened a coal-bed, and remained about twelve years. In 1842 he leased a part of it to Norton; the plaintiff went into possession of the Miner lot in 1843 or 1844, after the deed from his father; witness "put in two or three men" who occupied the land or parts of it for plaintiff; they continued in till plaintiff was turned out. John B. Quick by his hands, from 1826 took coal from the land, and sold it to New York; witness went to Tioga county in 1852.

D. T. Lewis had a lease from plaintiff to mine coal; he went there in 1855, and was put out of possession by Page in 1856.

John B. Quick (in deposition) testified: that he never gave up possession, but in 1841 he leased to Jacob; that he and those under him paid the taxes until plaintiff went into possession; John Q. Smith was in under witness for eight or nine years; that the deed to Cooper and Lefoy was obtained fraudulently, and he told them they should not have possession until they paid according to the contract.

The plaintiff gave in evidence a lease from John B. Quick (by attorney) to John Q. Smith for the Miner and Lewis lots for one year from April 1st 1834; also lease from same to F. A. L. Smith for one year from April 1st 1835; also lease from same to Jacob for three years from April 1st 1841, reciting that lessee had been in possession under a verbal agreement; also a lease from plaintiff to Baker for two years from April 1st 1846, which was continued for one year from April 1st 1848; also from same to Rummerfield, from April 1st 1854 to April 1st 1860, excepting right to mine coal; also lease from same to Daniel T. Lewis, dated November 8th 1856 till April 1857, of house on Miner lot.

Rummerfield went into possession under his lease, and continued until removed by Page and others.

Plaintiff then gave in evidence deeds dated May 8th and 9th 1826 from John B. Quick to George Biddis for one-fourth of the

Miner lot, Lewis lot and David lot, recorded May 23d, for the consideration of $6000, with evidence that Quick at their date was indebted to Biddis, who agreed to furnish him more money, and the conveyance was made as security, and the money owing by Quick had been paid. The plaintiff then offered exemplification of record of Pike county, and award of arbitrators in suit of George Biddis *v.* John B. Quick.   Objected to.

1. That it is not evidence, without first showing notice to the defendants, and those under whom they claim.

2. That the papers are not connected together.

3. That it is not an entire record.

The evidence was admitted, and a bill of exceptions sealed.

The record showed an award against Quick for $709.43, " with consent of plaintiff.   When paid, plaintiff shall convey to defendant all of above land conveyed to George Biddis as security for the above debt." * * *   The record showed satisfaction, March 31st 1835.

He gave in evidence the following assessments of taxes :—

1806 till 1827.   John B. Quick, improved and unimproved.

1828 till 1831.   George Biddis & Co.

1832 till 1843.   F. A. L. Smith, except 1841, when there was no assessment.

1843.   John B. Quick and Jacob R. Quick.

1844 till 1849.   Same, Thomas Clark, P. A. L. Quick and F. A. L. Smith.

1850.   No assessment.

1851 till 1853.   Jacob R. Quick.

1854, 1855.   No assessment.

1856.   Plaintiff, " 386 acres known as Miner lot."

After the plaintiff closed, the defendants gave evidence tracing their title as before stated; amongst other things they gave in evidence a conveyance by the executor, &c., of Biddis to F. A. L. Smith, for an undivided fourth of land ; from Smith to Clark, from Clark's executors to Phelps, and thence through divers conveyances to the defendants ; also, articles of association, dated October 17th 1825, between the persons for whom the conveyance of the land on the same day was made in trust to Frost and Loring, including John B. Quick. By the articles, reciting amongst other things that Quick was entitled to ten undivided fortieth parts of the land, the associates formed of themselves " The Lackawanna Coal Company," with a capital made up of the land, to be divided into 1000 shares of $50 each, of which 200 shares were to be used for working the mines, &c., and the remaining 800 shares to be divided amongst the associates in proportion to their respective interests in the land; also the transfer of 195 shares of Lackawanna Company stock by John B. Quick, the last transfer being March 14th 1827. They also gave evidence to show

that John B. Quick was in their employ on the land; also, that John B. Quick had acknowledged that the land belonged to the company, and he had a small share in it, with other evidence for the purpose of showing that John B. Quick did not claim to be on the land in his own right.

Joseph Slocum testified that he found Jacob Quick and Mrs. Phillips on the Miner lot, she having a husband living at the time. Her children were then with her.

Defendants offered to prove by witness "that in 1841 he found Mrs. Phillips living in the Miner house; that she said to him that the house was empty, and she was told to go in and stay, and that Jacob R. Quick came and she let him into possession with her."

The evidence was objected to by plaintiff as irrelevant, rejected by the court, and a bill of exceptions sealed.

The defendant gave in evidence proceedings in ejectment at the suit of Thomas Clark against Jacob R. Quick for the Miner, Lewis and David lots in which Quick confessed judgment to Clark for the fourth on the 21st of August 1843. He also offered in evidence the record of proceedings in partition of the land in controversy, Clark against Frost and Loring, trustees. The offer was objected to and rejected, and a bill of exceptions sealed.

The evidence was very voluminous, conflicting and complicated; it is supposed the foregoing, with the charge of Judge Streeter, will present intelligibly the questions decided by the Supreme Court.

Defendants asked the court to charge the jury :—

2. That, to acquire title under the Statute of Limitations by John B. Quick against his own grantees by deed, notice of his intention thus to acquire title must be shown to have been direct, clear and positive, and the statute will run only from such notice.

3. That, under the evidence, John B. Quick was in 1825 a cestui que trust of Frost and Loring, and no sufficient evidence of notice of ouster of the trustees appears until the deed of 8th and 9th May 1826, and then only of one-fourth interest undivided in the lands in dispute, and the confession of judgment in ejectment by Jacob R. Quick, (then and at the time of service) a tenant of John B. Quick, was an attornment to Thomas Clark (which Jacob R. under the claim of plaintiff in this case had the right to make), and tolled the Statute of Limitations, so far as this defendant is concerned, as to the one-fourth interest, and for that plaintiff cannot recover.

4. That, as to the remaining three-fourths interest undivided, plaintiff shows no sufficient evidence of notice of ouster until 1844, at the time of the deed from John B. Quick to plaintiff, describing the grantor's interest as "three-fourths or all my interest," and the statute not having run since that time before the bringing of this suit, the plaintiff cannot recover for that interest.

18 P. F. Smith—13

[Susquehanna, &c., Railroad Co. *v.* Quick.]

10. That if John B. Quick, on 8th and 9th May 1826, had any title to convey to George Biddis, and if such conveyance should, by the jury, be believed to have been for the security of money, in the absence of testimony that these defendants had notice thereof, they are bonâ fide purchasers without notice, and cannot be affected thereby.

The court charged: * * * " The defendants have shown a regular legal title to this land. The plaintiff cannot and does not controvert the regularity of this chain of title from the Commonwealth to the defendants. But he claims title under the Statute of Limitations, and this is the leading question in the cause. The trust deed made John B. Quick a cestui que trust of Frost and Loring ; and, to enable him to acquire title by the Statute of Limitations against his trustees and co-tenants, he must oust them from the possession and hold the actual, visible, notorious, hostile, continuous and uninterrupted possession for twenty-one years. The trustees and co-tenants, in order to be affected, must have had notice of the intention of John B. Quick to change the character of the possession—in other words, notice that he claimed to hold in hostility to them. [But an ouster need not necessarily be proven by direct and positive notice of an intention to exclude the trustees and co-tenants. Ouster and adverse possession may be presumed by the jury, from ' open, notorious and uninterrupted possession of the whole by a tenant in common for twenty-one years, claiming the whole land as his own, and taking the whole profits exclusively to himself.' These facts do not constitute a legal presumption of ouster—they are facts from which a jury may infer ouster and adverse possession ; if the evidence satisfies their minds, the fiduciary character of the relation has been determined and notice of such determination has been brought home to the parties to be affected.] [If the jury shall be satisfied from the evidence that John B. Quick and Peter A. L. Quick, by themselves and by tenants, held actual, visible, notorious, hostile, continuous and uninterrupted possession of this land, or any portion of it, for twenty-one years prior to 1856, and that the trustees and co-tenants had notice of such adverse and hostile holding, the plaintiff may recover to the extent of such possession.]" The court here referred the jury in general terms to the evidence on both sides relating to the possession, and proceeded : "It has been already said, the possession necessary to give title under the statute must be continuous and uninterrupted. There must be no break in the continuity of the possession. An entry by the owner or an action of ejectment prosecuted to judgment will suspend the statute—as it is termed, will toll the statute. [A vacancy in the possession caused by a tenant's going out a few weeks, or even a few months, before another tenant comes in, does not break the continuity of the possession, if the

[Susquehanna, &c., Railroad Co. v. Quick.]

landlord have his title upon record, and does not intend to relinquish his possession, and puts another tenant in before his possession is disturbed by another claimant.   Peter A. L. Quick had his title upon record in 1844; but John B. Quick, who claims to have been in possession by his tenants up to that time, had no record title; and a vacancy of one day prior to 1844, caused by one tenant's going out before another came in, would have broken the continuity of the possession.   If the jury find from the evidence any such break in the possession, the previous possession goes for nothing, and the plaintiff must begin his possession anew.]

" On the 21st of November 1845, Frost and Loring brought an ejectment against Jacob R. Quick in the Common Pleas of Luzerne county, and in the precipe and summons described the three lots, known as the Miner, Lewis and Daniel David lot. On the 10th of May 1853, Jacob R. Quick confessed judgment, and this judgment was executed in 1856, by putting the defendants in this suit in possession.   Cross-interrogatories were filed in the case, which were signed by several attorneys, and among them A. T. McClintock signed them as attorney for Peter A. L. Quick.   Jacob R. Quick had purchased the Daniel David lot by deed in 1843, and he testifies that at the time of the bringing of the ejectment he was in possession only of the Daniel David lot, and was not in possession of either the Miner or Lewis lot.   If Jacob R. Quick was in possession of the Miner lot by lease, or otherwise, this ejectment prosecuted to judgment tolled the statute, and, the statute not having run at that time, the plaintiff cannot recover.   Or if you believe from the evidence that Peter A. L. Quick employed counsel to defend that suit, the plaintiff cannot recover, even though Jacob R. Quick was in possession only of the David lot under his deed.

[" From the papers in evidence, and from testimony of Mr. McClintock and P. A. L. Quick, you will determine how the fact is.   If Jacob R. Quick was not in possession of any other land than his own in 1845, and if P. A. L. Quick did not defend that suit or employ counsel to defend it, then the ejectment did not toll the statute, and is no bar to the plaintiff's recovering.]

" There is another branch to this case to which I will now briefly call your attention.   On the 8th of May 1826, John B. Quick deeded one undivided fourth of lot 42, and of the Daniel David lot, to George Biddis.   On the 9th of May he conveyed one undivided fourth of the Lewis lot to George Biddis.   On the 16th of September 1830 the executor of George Biddis conveyed this title to Francis A. L. Smith.   In 1841 Smith conveyed to Thomas Clark.   This title is now vested in the defendants.   It is claimed by the plaintiff that these deeds to Biddis were given to secure the repayment of a loan of money; and that the money has been

repaid. A deed absolute upon its face may be shown by parol, if the evidence is clear and explicit, to be security for money loaned, and only a mortgage. [It is further claimed by the plaintiff that Smith and Clark had actual notice and full knowledge of the character of this deed. And it is further claimed that when the defendants and the grantees of Clark's executors acquired title, John B. Quick was in the actual possession of the property. If you find all these facts as claimed by the plaintiff, the defendants cannot hold the one undivided fourth of the land under this Biddis title. If the deed was given to secure the repayment of a loan and has been paid, and Smith and Clark both had actual notice of this fact; and at the time Clark's executors conveyed to John C. Phelps, John B. Quick and those claiming under him were in the actual, visible and notorious possession of the land, and continued such possession down to 1856, such possession was constructive notice of the character of this Biddis title, and the defendants will not be protected by it.] If you find any of the facts just stated against the plaintiff, the defendants will be entitled to hold this undivided one-fourth, and this right is in no way affected by the Statute of Limitations.

"In reference to the general question of possession, it should be observed that possession of one lot having distinct boundaries cannot be extended to another and distinct lot. In this case there is no evidence of any actual possession of the Lewis lot. The plaintiff has therefore failed to give any evidence of title to that lot under the Statute of Limitations; and as to that lot your verdict must be against the plaintiff." * * *

In answer to the points he said :—

" 2. This point is affirmed to this extent : The grantees must have had notice of John B. Quick's intention to hold adversely to them ; but that notice may be presumed by the jury if they believe from the evidence that John B. Quick, the grantor, claimed the whole land as his own, took the whole profits exclusively to himself, and continued in the actual, visible, notorious and uninterrupted possession of the land for twenty-one years prior to 1856."

" 10. This point is correct; but if the jury find that at the time of the defendants' purchase of this title Quick was in the actual, visible and notorious possession of the property, such possession would be constructive notice and equivalent to actual notice."

The verdict was for the plaintiff for the Miner lot.

The defendants took out a writ of error, and assigned twenty-two errors :—

4. Admitting the exemplification of the record, Biddis *v.* Quick.

10. Rejecting the declarations of Mrs. Phillips.

11. Rejecting the proceedings in partition, Clark *v.* Frost *et al.*

14, 15, 21, 22. The answers to the defendants' 3d, 4th, 2d and 10th points.

16–20. The parts of the charge in brackets, the 18th assignment being to the part of the charge which related to " a vacancy in possession for a few weeks or months," &c.

*W. H. Jessup* and *A. Hand* (with whom was *E. F. Hodges*), for plaintiffs in error.—As to the 4th assignment they cited Todd *v.* Campbell, 8 Casey 250; Odenbaugh *v.* Bradford, 17 P. F. Smith 96. As to 10th, Brolasky *v.* McClain, 11 Id. 167. As to the 18th, Brolasky *v.* McClain, *supra;* Olvine *v.* Holman, 11 Harris 284; Stephens *v.* Leach, 7 Id. 262; Zubler *v.* Schrack, 10 Wright 70; Lawrence *v.* Hunter, 9 Watts 76.

*J. Handley* and *J. W. Maynard,* for defendants.—As to the 18th assignment cited Cunningham *v.* Patton, 6 Barr 359; Johnston *v.* Irwin, 3 S. & R. 291; Hubley *v.* Vanhorne, 7 Id. 192; Royer *v.* Benlow, 10 Id. 306; Mercer *v.* Watson, 1 Watts 338; Hopkins *v.* Robinson, 3 Id. 205; Hoey *v.* Furman, 1 Barr 295; Porter *v.* McGinnis, Id. 413; Stephens *v.* Leach, 7 Harris 262.

The opinion of the court was delivered, May 8th 1871, by

AGNEW, J.—The 18th assignment contains the only serious error in the instructions of the court which needs notice. The court charged that " a vacancy in the possession caused by a tenant's going out even for a few months, before another tenant comes in, does not break the continuity of the possession, if the landlord have his title upon record, and does not intend to relinquish his possession and put another tenant in before his possession is disturbed by another claimant. Peter A. L. Quick had his title upon record in 1844; but John B. Quick, who claims to have been in possession by his tenants up to that time, had no title; and a vacancy of one day prior to 1844, caused by the tenant's going out before another came in, would have broken the continuity of the possession." As an unqualified instruction upon the doctrine of the Statute of Limitations, this portion of the charge is erroneous. The distinction between a trespasser without, and one with title on record, in its effect upon the continuity of possession, has no place in the law. The deed from John B. to Peter A. L. Quick, which the learned judge calls title, is nothing but the link connecting together the possession of these two persons, whose possession otherwise would be independent and distinct trespasses. Where the question is upon the extent of possession, of one without title, the deed, warrant, survey or other evidence of supposed title may give color to and extend the possession by presumption beyond his actual enclosure or cultivation; but it can have no possible effect upon the fact whether he has continued in the possession or left it. In view

of the circumstances of this case, the latitude of time allowed by the judge to preserve the continuity of possession, is important. A few months, because of the favor shown to the man with a deed or record, might be six, eight or ten. Now, clearly, it is not the law that possession can actually be abandoned for so many months, even though the trespasser intend to return. There is no resemblance in this respect between the case of a trespasser on the title of another, and a settler by improvement on vacant land. The *animus revertendi*, which evinces the intention of the settler to gain a rightful title under the authority of the state, cannot, in the case of a trespasser, supply the place of an actual possession to obtain a title by wrong. As a circumstance of evidence, the *animus revertendi* may, with other *indicia*, tend to show that the actual possession has not been abandoned, as where the party leaves crops in the ground, and large improvements, or cattle grazing in the fields. Even non-residence will not toll the statute where the party keeps up his possession by cultivation. It is well settled that actual possession may be either by residence or by cultivation, and need not be by both. Had the court qualified this portion of the charge, so as to give the jury to understand that they meant only a suspension of residence and not a vacancy in possession, there would have been no error. But the language was "a vacancy of possession for a few months." In this case it was important that the instruction to the jury should be carefully guarded, for the improvements on some of the tracts were very insignificant, while the occupancy consisted partly in mining coal at intervals; the tenants were numerous, their removals frequent, and altogether the possession bordered closely on the loose and roving. The case of Cunningham *v.* Patton, 6 Barr 355, has been cited to show that an interval of four months will not destroy the continuity of possession. The facts of this case are very briefly reported, and it is evident the language of Coulter, J., has reference to features not presented clearly. The judge in the court below charged " that there was no suspension of the possession by reason of Duval having left it for a short time under the circumstances." What these circumstances were, is the defect in the report, but the only point made in the argument of the counsel for the defendant in error was, that residence is not necessary to make an adverse possession; while Coulter, J., remarked, " that during these four months the trespasser could not have returned the land unseated "—" there were the house and barn, and the land cleared to warn him to inquire after the settler "—" his absence was during the period when the farmer does not bestow his labor on the soil, it was neither seed-time nor harvest." It seems to be a case not of a suspension or abandonment of possession, but of residence, where there were *indicia* to show that the possession was otherwise kept up, and in view of this the *animus*

[Susquehanna, &c., Railroad Co. v. Quick.]

*revertendi* was a circumstance in the evidence, leading the Justice to resemble it to the case of a settler. If the case were not of this character it cannot be sustained; and the analogy to the case of a settler would well deserve the strong criticism of Gibson, J., in Stephens *v.* Leach, 7 Harris 262. In the last case the correct principles of the statute were stated by the former Chief Justice. " Adverse possession," he says, " professing as it does to be founded not on title but on trespass, is essentially aggressive, and the stamp of its character must always be preserved by acts on the premises. A man does not discontinue his possession by locking up his house in town, or suspending his cultivation in the country, provided he do not suffer the buildings in the one case, or the fields in the other, to be thrown open; but he is bound to continue a positive appearance of ownership, by treating the property as his own, and holding it within his exclusive control. An intention to resume a suspended intrusion of which the owner of the title may know nothing, is short of the requirement of the statute. The question is not, what did the outgoing occupant intend, but what did he do? Did he keep his flag flying and present a hostile front to adverse pretensions? An adverse possession ought to be such as to challenge the right of all the world; but when an occupant has evacuated the place and suffered it to go to wreck, he hauls down his colors and his challenge is withdrawn." The language is perhaps too figurative to be entirely plain, but the scope and purpose of it is to show, that when one leaves the ground personally, he must leave it under circumstances indicating that he has not left the possession, but still holds it. There must be that in the condition and appearance of the premises themselves that show to the world that there is still a person in possession. The unqualified language of the judge below, in the present case, would scarcely lead the jury to distinguish between a mere interval in the occupancy by personal residence, and an interval of actual possession, which would break the continuity of possession; and the obscurity was not diminished when he referred to the continuity being broken by a single day's vacancy of possession, where the title was not on record. He must have meant the same kind of vacancy of possession when referring to that of a single day and to that of a few months; and if not, then his charge was contradictory. This part of the charge was therefore erroneous, for it left the jury without a consistent rule to guide them in this complicated case, upon its facts.

We are not very clear as to some of the bills of exception to the admission and rejection of evidence. In a case of such numerous facts and complication of detail, it is not easy to pronounce upon every exception. We may say, however, we are not clear that the rejected evidence referred to in the 10th assignment of error was irrelevant. Phillips being found in possession

[Susquehanna, &c., Railroad Co. *v.* Quick.]

of a part of the property, it would seem to us that her account while in possession of the manner she came there would be competent to show under whom she was living there, and this whether she was a married woman or not. The character of the possession of a party as stated by himself while in possession is part of the *res gestœ.* It was not offered to affect the rights of her husband or of his landlord, if he had any, for so far as we understand the evidence (in which indeed we may err), there was no possession of the husband or lease to him; but the offer seems to relate to an independent possession by Mrs. Phillips herself, which it was the right of the party to have referred to the jury.

Nor do we see why the record in the action of partition brought by Clark against Frost & Loring trustees, was irrelevant, though it was rather unimportant. We shall, however, not refer to the bills of exception in detail further than to say that some are not sustained, others were saved by the introduction afterwards of the deeds and other writings not in evidence when the objections were made; and others are not sufficiently before us to decide them. Among the last class is the exemplification of the record from Pike county, of the case of George Biddis *v.* John B. Quick. The certificate of the prothonotary is not printed for us, or it may be there was no general certificate attached to the exemplification. It would seem from the statement in the bill of exception, that the record consisted of loose and detached parts. If that be the fact, there was error in receiving the detached papers. The record must be made up and certified as a whole. This error, if it be one, can be corrected by making up a proper record and certificate.

Judgment reversed, and a *venire facias de novo* awarded.